UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

CHRISTINE ABATE                         CIVIL ACTION NO. 6:14-cv-02889

VERSUS                                  JUDGE HAIK

U.S. COMMISSIONER,                      MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be REVERSED and

REMANDED for further administrative action.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Christine Abate, fully exhausted her administrative remedies

prior to filing this action in federal court.  The claimant filed an application for a

period of disability and for disability insurance benefits ("DIB"), alleging disability

beginning on May 31, 2009.[1]  Her application was denied.[2]  The claimant requested

a hearing,[3] which was held on March 26, 2013 before Administrative Law Judge

---

[1]     Rec. Doc. 3-1 at 126.

[2]     Rec. Doc. 3-1 at 57.

[3]     Rec. Doc. 3-1 at 70.

Carol Lynn Latham.[4]  The ALJ issued a decision on June 5, 2013,[5] concluding that

the claimant was not disabled within the meaning of the Social Security Act ("the

Act") from May 31, 2009 through the date of the decision.  The claimant asked for

review of the decision,[6] but the Appeals Council concluded on August 5, 2014 that

no basis existed for review of the ALJ's decision.[7]  Therefore, the ALJ's decision

became the final decision of the Commissioner for the purpose of the Court's review

pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review

of the Commissioner's decision.

## FACTUAL BACKGROUND

The claimant was born on October 20, 1959.[8]  At the time of the ALJ's

decision, she was fifty-three years old.  She has a high school education,[9] and past

relevant work experience as a bartender, waitress, and receptionist.[10]  She alleges that

---

[4]      Rec. Doc. 3-1 at 34-56.

[5]      Rec. Doc. 3-1 at 23-30.

[6]      Rec. Doc. 3-1 at 17.

[7]      Rec. Doc. 3-1 at 4.

[8]      Rec. Doc. 3-1 at 37.

[9]      Rec. Doc. 3-1 at 38.

[10]     Rec. Doc. 3-1 at 49, 176.

she has been disabled since May 31, 2009[11] due to degenerative disc disease, spinal stenosis, herniated cervical discs, bone spurs, pain since cervical laminectomy surgery, the requirement that she wear a hard cervical collar following surgery, the inability to pick up objects after surgery, and the inability to drive after surgery.[12]

The claimant saw Dr. Ronald M. Lahasky, an internist, on June 19, 2009.[13] She reported moderate numbness or tingling of her left arm up to her neck.  She also reported that she was seeing Dr. Jeremy Romero, but the record contains no documentation of visits with him in this time frame.  The claimant reported to Dr. Lahasky that she had been seen at Louisiana State University's University Medical Center and was told that there was no available treatment for her condition because it might paralyze her.[14]  Dr. Lahasky diagnosed her with cervical spondylosis, osteoarthritis of the right jaw,  hypertension, restless leg syndrome, and a streptococcal throat infection.

The claimant treated with a chiropractor, Dr. Virgil Bryant, starting on August 3, 2009 and ending on September 21, 2009.[15]  She provided a history of neck pain

---

[11]     Rec. Doc. 3-1 at 126.

[12]     Rec. Doc. 3-1 at 643.

[13]     Rec. Doc. 3-1 at 241-242.

[14]     There is no document in the record corroborating this information.

[15]     Rec. Doc. 3-1 at 210-234.

starting in May 2009 and getting progressively worse.  She described the pain as constant.  At that time, she was taking Soma, Lortab, and blood pressure medicine.[16] She also reported a history of low back pain for the past fifteen years[17] and described her neck pain as radiating into her shoulders and left arm and gradually progressing over a six month period.  She described her pain as severe, and she stated that she had to change employment and could only work four days per week.[18]  A radiologic report dated August 5, 2009 noted mild degenerative changes at C5-6 and C6-7.[19]

On April 13, June 3, and November 30, 2010, the claimant sought chiropractic treatment from Dr. Jeremy Romero for complaints of lumbar pain.[20]

On December 3, 2010, the claimant again saw Dr. Lahasky, complaining of a sore throat.[21]   He diagnosed her with acute pharyngitis, cervical spondylosis, osteoarthritis of the right jaw, restless leg syndrome, and hypertension.

---

[16]      Rec. Doc. 3-1 at 210-211.

[17]      Rec. Doc. 3-1 at 216.

[18]      Rec. Doc. 3-1 at 216-217.

[19]      Rec. Doc. 3-1 at 220.

[20]      Rec. Doc. 3-1 at 236-237.

[21]      Rec. Doc. 3-1 at 239-240.

The majority of the claimant's medical records are from the Louisiana State University system.  In fact, other than those summarized above, the record contains no medical records from any health care providers other than those with  LSU.

On June 17, 2009, the claimant was seen at the emergency department of LSU University Medical Center in Lafayette, Louisiana (hereinafter "UMC.")[22]   She complained about neck pain and pain, tingling, and numbness in her left arm.  X-rays of the cervical spine showed mild degenerative changes at C5-6 and C6-7.

On January 28, 2010, the claimant was seen at the internal medicine clinic at UMC.[23]  Her primary complaint was neck pain.  She reported that the pain had started one day without trauma, and that she thought she had slept wrong, but the pain had persisted for a year.  She stated that physical therapy[24] and chiropractic treatment had provided no relief.  She stated that her primary care physician had given her Lortab, which she takes when the pain is severe.  She reported that the pain interferes with her sleep.  She was given a prescription for Lortab.  Her hypertension was described as controlled, and she was encouraged to lose weight.

---

[22]      Rec. Doc. 3-1 at 311-319.

[23]      Rec. Doc. 3-1 at 307-309.

[24]      The record contains no documentation of physical therapy at any time.

The claimant was scheduled to have a cervical MRI performed at UMC on February 26, 2010, but it was cancelled because she had an IUD that made the proposed testing unsafe.[25]

On March 19, 2010, the claimant was seen in the internal medicine clinic at UMC.[26]  She complained of left shoulder pain.  The doctor noted that her MRI could be rescheduled because the IUD had been removed.

On June 8, 2010, the claimant was again seen in the internal medicine clinic at UMC to get the results of the MRI.[27]  She was still complaining about left shoulder and neck pain with numbness and tingling in her left arm.  According to the treatment notes, an MRI of April 16, 2010 showed mild posterior disc bulges from C3-4 to C6-7 with mild spinal stenosis and foraminal restriction.  The claimant was referred to the neurosurgery department.

On September 30, 2010, the claimant was seen in the emergency department at UMC for a gynecological matter.[28]  Even though a cervical MRI was previously performed, purportedly after removal of her IUD, the treatment note indicates that the

---

[25]     Rec. Doc. 3-1 at 303-304.

[26]     Rec. Doc. 3-1 at 300-302.

[27]     Rec. Doc. 3-1 at 295-298.

[28]     Rec. Doc. 3-1 at 284-293.

IUD was still in place and needed to be removed.  On October 1, 2010, the claimant was seen at UMC's gynecology clinic.[29]  On that date, she again reported that an IUD remained in place.  Because the claimant does not contend that she is disabled due to gynecological problems, further medical consultations for such problems will not be summarized in this report.

On November 19, 2010, the claimant was seen at the Louisiana State University Health Sciences Center in Shreveport, Louisiana on referral from UMC.[30] She complained of left arm pain and neck pain.  She reported that the pain began in January 2010 as a crick in her neck that progressed to neck pain with radiation to her left elbow associated with numbness, tingling, weakness, and clumsiness.  She stated that the pain was constant and she rated it a nine on a numerical scale.  She had a limited range of motion in her neck in all directions, and her neck and trapezius area were tender.  She also had moderate paraspinous spasms.  She had a full range of motion in her shoulder, but tenderness and swelling were noted.  The claimant was diagnosed with degeneration of the cervical discs and neck surgery was discussed.

---

[29]     Rec. Doc. 3-1 at 294.

[30]     Rec. Doc. 3-1 at 328-332.

The claimant was seen at UMC on November 30, 2010.[31]  Her medications were adjusted, and it was noted that she was scheduled for neurosurgery in January. At that time, she was prescribed Elavil, Lortab, and Enalapril.  However, there is no indication in the record that the claimant actually underwent surgery in January 2011.

On December 6, 2010,[32] the claimant presented at the emergency department of UMC, complaining of low back pain that had lasted for a week.  She reported that her left leg felt heavy and numb and that the back pain radiated into her left hip.

On March 17, 2011, the claimant was seen at the internal medicine clinic at UMC.[33]  Her primary complaints were neck and back pain.  The treatment note indicates that the claimant was scheduled to have neck surgery in Shreveport.  Her hypertension was said to be controlled, and her obesity was noted.

On April 5, 2011, an MRI of the claimant's lumbar spine was performed at UMC.[34]  No focal disc herniations, canal stenosis, or foraminal compromise were present; therefore, the MRI was normal.

---

[31]     Rec. Doc. 3-1 at 279.

[32]     Rec. Doc. 3-1 at 273-278.

[33]     Rec. Doc. 3-1 at 636-640.

[34]     Rec. Doc. 3-1 at 631.

The claimant was seen in the emergency department at UMC on May 19, 2011 for a matter unrelated to her disability claim.[35]

On August 11, 2011, her Ultram prescription was refilled and the dosage was increased.[36]   At that time, she reported that taking pain medication every six hours was not controlling her pain.   The treatment note also indicates that she was scheduled for neck surgery in Shreveport the next week.

Dr. Donald Smith performed a C3-C6 decompressive cervical laminectomy on August 17, 2011 at the LSU Health Sciences Center in Shreveport.[37]   The preoperative and postoperative diagnoses were the same:  cervical stenosis with ossification of the posterior longitudinal ligament.

On September 19, 2011, the claimant presented at the emergency department of UMC complaining of left hip and leg pain that started a week after her neck surgery.[38]  The clinical impression was musculoskeletal strain.  She was given pain medication and discharged.

---

[35]    Rec. Doc. 3-1 at 618-628.

[36]    Rec. Doc. 3-1 at 613.

[37]    Rec. Doc. 3-1 at 321-322, 407-408, 461-503.

[38]    Rec. Doc. 3-1 at 604-612.

X-rays taken in Shreveport on October 28, 2011 showed degenerative changes in the cervical spine without changes in flexion and extension.[39]

The claimant was seen in Shreveport on December 13, 2011.[40] The treatment note indicates that the claimant was placed in a hard collar on October 28, 2011 because she was complaining that she was unable to hold her head up. At the December visit, she was continuing to complain of pain and numbness and a continued inability to hold her head up. The plan was to continue use of the collar, undergo physical therapy for neck muscle strengthening, and return in two months. The doctor noted that the range of motion in her neck was decreased, extension was severely limited, lateral flexion was severely limited, anterior flexion was moderately limited, there was tenderness, and there were paraspinous spasms.

At the follow-up visit on February 7, 2012,[41] the claimant reported that her numbness was improved but her neck pain had continued. She had not yet undergone physical therapy due to insurance reasons. She was advised to continue wearing the collar and she was encouraged to participate in physical therapy. X-rays showed that

---

[39]    Rec. Doc. 3-1 at 323, 538-539.

[40]    Rec. Doc. 3-1 at 333-335.

[41]    Rec. Doc. 3-1 at 537, 337-340.

there was no collapse or misalignment in the cervical spine in flexion and extension but mild degenerative changes with decreased height of the intervertebral spaces.

On February 28, 2012, the claimant was seen at UMC's internal medicine clinic,[42] complaining of back and neck pain.  Her Ultram and Soma prescriptions were refilled.  However, the physician noted that she would be weaned off the pain medication.  It was noted that her hypertension was well controlled.

On May 22, 2012, the claimant was seen at LSU – Shreveport.[43]  The doctor noted that, since surgery, her numbness had improved but she was continuing to have "a lot" of neck pain.  She was supposed to have had physical therapy, but had not done so for financial reasons.  Cervical spine x-rays were normal and no neurological deficits were noted.  The doctor also noted that no surgical intervention would be likely to help her neck pain.  He was making a pain management referral to UMC.

On July 17, 2012, the claimant returned to the internal medicine clinic.[44]  She reported worsening neck pain with pain radiating into her right hand.  The doctor diagnosed cervicalgia and recommended a repeat MRI. Her blood pressure was noted to be "at goal."

---

[42]     Rec. Doc. 3-1 at 600-602.

[43]     Rec. Doc. 3-1 at 376-382.

[44]     Rec. Doc. 3-1 at 581, 590, 593-596.

On August 2, 2012,[45] an MRI was performed.  It revealed very mild multilevel disc bulges from C3-4 to C6-7 similar to the previous MRI with no scarring or new areas of disc herniation.  The cervical cord showed normal signal appearance.

On September 18, 2012, the claimant presented at the emergency department of UMC.[46]  Her chief complaint was neck pain with tingling in her left arm.  She was given Toradol and Prednisone and released.

On October 1, 2012, the claimant was seen at UMC's internal medicine clinic again complaining about neck pain.[47]

The claimant returned to the internal medicine clinic on February 6, 2013.[48] The reasons for her visit were hypertension and back pain.  The treatment note indicates that she would be referred to pain management.  However, the record contains no information concerning whether such a referral was actually made or whether the claimant is currently treating with a pain management doctor.

At the time of the hearing on March 26, 2013, the claimant was taking Ultram or Tramadol for pain; Robaxin, a muscle relaxant; Neurontin, which helps with sleep;

---

[45]      Rec. Doc. 3-1 at 561-565.

[46]      Rec. Doc. 3-1 at 579-580, 582-589.

[47]      Rec. Doc. 3-1 at 576-578.

[48]      Rec. Doc. 3-1 at 553-557.

Amiditrypatelean for anxiety; and Enalapril and Hydrochlorothaazide for hypertension.[49]

### ANALYSIS

**A.**   **STANDARD OF REVIEW**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[50] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[51] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[52]

---

[49]      Rec. Doc. 3-1 at 41, 52.

[50]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[51]      *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[52]      *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

-13-

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[53]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[54]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[55]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[56]

---

[53]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[54]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[55]     *Martinez v. Chater*, 64 F.3d at 174.

[56]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

**B.    ENTITLEMENT TO BENEFITS**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[57]

The terms "disabled" and "disability" refer to the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[58]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[59]

---

[57]    See 42 U.S.C. § 423(a).

[58]    42 U.S.C. § 1382c(a)(3)(A).

[59]    42 U.S.C. § 1382c(a)(3)(B).

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  At step one, an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings. At step two, an individual who does not have a severe impairment will not be found disabled.  At step three, an individual who meets or equals an impairment listed in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors.  If an individual is capable of performing the work he has done in the past, a finding of not disabled will be made at step four. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity will be considered to determine if the claimant can perform any other work at step five.[60]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[61] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the

---

[60]      20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[61]      20 C.F.R. § 404.1520(a)(4).

record.[62]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[63]

The claimant bears the burden of proof on the first four steps.[64]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[65]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[66]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[67]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[68]

---

[62]   20 C.F.R. § 404.1545(a)(1).

[63]   20 C.F.R. § 404.1520(e).

[64]   *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[65]   *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[66]   *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[67]   *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[68]   *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

-17-

**D.**   **THE ALJ'S FINDINGS AND CONCLUSIONS**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since May 31, 2009.  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments: status post cervical laminectomy on August 17, 2011, degenerative disc disease, osteoarthritis, hypertension, and obesity.  This is supported by the evidence in the record.

At step three, the ALJ found that the claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of a listed impairment.  The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform the full range of light work.  The claimant disputes this finding.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a receptionist.  Having found the claimant not disabled at step four, the ALJ did not proceed to step five.  The claimant challenges the ALJ's step four finding of no disability.

E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred in four ways:  first, by finding that the severity of the claimant's impairments does not meet or medically equal a listing; second, by finding that the claimant retains the residual functional capacity to perform the full range of light work; third, by failing to seek clarification or additional evidence from the claimant's treating physicians before evaluating the claimant's residual functional capacity; and, fourth, by failing to consider the entire record.

F.    DID THE ALJ ERR IN FINDING THAT THE CLAIMANT'S IMPAIRMENTS DO NOT MEET OR MEDICALLY EQUAL A LISTING?

The claimant's first argument is that her impairments meet or medically equal a listing.  But the claimant does not identify the listing that she allegedly meets or equals.  Her primary complaint centers on her neck pain.  Listing 1.04, which addresses disorders of the spine defines such disabling disorders to include spinal stenosis, osteoarthritis, and degenerative disc disease – all of which the claimant has – but only if these conditions result in compromise of a nerve root or the spinal cord. The claimant's medical records contain no evidence indicating that she has either a cervical spine condition or a lumbar spine condition that compromises a nerve root or the spinal cord.  Accordingly, the ALJ did not err in finding that the claimant's spine condition does not meet a listing.

-19-

The claimant's other severe impairments are hypertension and obesity.  The record indicates that the claimant's hypertension is controlled with medication.[69] Therefore, it is not disabling on its own.[70]  The claimant does not explain how the combination of the hypertension and obesity, along with her spine condition, satisfies the requirements for any listing or medically equals any listing, nor does she cite any listing that she claims is satisfied or equalled.  For these reasons, the Commissioner's decision is based on substantial evidence in the record, and the claimant's argument lacks merit.

**G.    DID THE ALJ ERR IN FINDING THAT THE CLAIMANT CAN PERFORM THE FULL RANGE OF LIGHT WORK?    and    DID THE ALJ ERR IN FAILING TO ACQUIRE ADDITIONAL EVIDENCE FROM THE CLAIMANT'S TREATING PHYSICIANS?**

The next two assignments of error are interrelated and will be considered together.  The claimant argues that the ALJ erred by finding that she is capable of performing the full range of light work and also by failing to seek clarification or additional evidence from her treating physicians regarding her residual functional capacity.

---

[69]      Rec. Doc. 3-1 at 309, 594 ("BP at goal"), 601, 636.

[70]      *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("impairments that are remedied or controlled by medication or treatment are not disabling.").

-20-

The ALJ found that the claimant has the residual functional capacity to perform the full range of light work.  Light work involves lifting no more than 20 pounds at a time but frequently lifting or carrying objects weighing up to 10 pounds.[71]  Light work also requires a person to be able to stand and walk for six hours out of an eight-hour work day.[72]  If a person is capable of doing light work, she is also capable of doing sedentary work "unless there are additional limiting factors such as . . . inability to sit for long periods of time."[73]  Thus, the ALJ found that the claimant is capable of lifting ten pounds frequently and up to twenty pounds occasionally and further found that she is capable of standing or walking for six hours per day.  The ALJ also determined, at step four of the sequential analysis, that the claimant is capable of doing her past relevant work as a receptionist, which is sedentary work.  Sedentary work is "performed primarily in a seated position" and requires the ability to sit for approximately six hours out of an eight-hour work day.[74]  Thus, the ALJ found that the claimant is capable of sitting for six hours a day.

---

[71]    20 C.F.R. § 404.1567(b).

[72]    Soc. Sec. Rul. 83-10, 1983 WL 31251, at *6; Soc. Sec. Rul. 96-9p, 1996 WL 374185, at *8.

[73]    20 C.F.R. § 404.1567(b).

[74]    Soc. Sec. Rul. 83-10, 1983 WL 31251, at *5.

The only evidence in the record concerning the amount of weight the claimant can lift is her own hearing testimony that she was instructed by her doctor after surgery that she was never to lift anything heavier than a gallon of milk.[75]  The only evidence in the record concerning the claimant's ability to sit, walk, or stand is her hearing testimony that she can stand or walk for only about fifteen or twenty minutes at a time[76] and can only sit for about ten or fifteen minutes at a time, causing her to constantly be changing positions.[77]  She also testified at the hearing that she was unable to do computer work at home because she can only sit for about fifteen minutes at a time.[78]  Although there is no evidence in the record that a treating physician has placed restrictions on the claimant's activities, there also is no evidence that a treating physician has evaluated the claimant's functional capacity.  On February 14, 2012, Dr. Charles Lee, a state agency medical consultant, recommended a light residual functional capacity for the claimant.[79]  But he did not examine the claimant and it is not clear what records, if any, he reviewed in preparing his determination.

---

[75]      Rec. Doc. 3-1 at 51.

[76]      Rec. Doc. 3-1 at 45.

[77]      Rec. Doc. 3-1 at 44.

[78]      Rec. Doc. 3-1 at 40, 44.

[79]      Rec. Doc. 3-1 at 346.

Although the claimant underwent cervical surgery in August 2011, the surgery did not relieve her neck pain complaints and the disc bulges that were apparent on the preoperative MRI were also depicted on the postoperative MRI, causing the radiologist who reviewed the more recent MRI results to state that the study showed "[s]tatus post laminectomy, with very mild multilevel disc bulges C3-4-C6-7 similar to previous study in 2010."[80]  The claimant has also been under doctor's orders to wear a hard cervical collar since October 2011.[81]  In December 2011, she had a limited range of motion in her neck as well as severely limited extension, severely limited lateral flexion, and moderately limited anterior flexion.[82]  Thus, there are objective findings in addition to her continued pain complaints that could affect her functionality.

Determining a claimant's residual functional capacity is a task reserved for the ALJ.[83]  However, the ALJ's determination must be supported by substantial evidence in the record.[84]  The claimant argued that the ALJ had a duty to recontact her treating

---

[80]  Rec. Doc. 3-1 at 561.

[81]  Rec. Doc. 3-1 at 333.

[82]  Rec. Doc. 3-1 at 335.

[83]  *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995), citing 20 C.F.R. § 404.1546.

[84]  *Ripley v. Chater*, 67 F.3d at 557.

-23-

physicians to clarify the evidence, but the government refuted that argument on the basis that the relevant statute has been revised to eliminate this duty.  Still, however, "the ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits.  If the ALJ does not satisfy his duty, his decision is not substantially justified."[85]  Thus, the statutory requirement concerning recontacting physicians has changed but the ALJ continues to have a duty to fully and fairly develop the record.  An ALJ has satisfied that duty when the record contains sufficient evidence for him to make an informed decision.[86]  So long as such evidence exists, the ALJ need not supplement the record with additional evidence.[87]

In this case, the ALJ's determination that the claimant can perform the full range of light work is not supported by substantial evidence in the record.  First, the record contains no evidence in the form of opinions from a physician or other health care provider who has evaluated or measured how much weight she can safely lift or how much time she can realistically sit or stand during a work day in light of her impairments.  Second, the claimant's testimony concerning her own subjective

---

[85]  *Ripley v. Chater*, 67 F.3d at 557, citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir.1984).

[86]  *Hernandez v. Astrue*, 269 F. App'x 511, 515 (5th Cir.2008), citing 20 C.F.R. §§ 404.1516, 416.916; *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).

[87]  See 20 C.F.R. §§ 404.1516, 416.916; *Hernandez v. Astrue*, 269 F. App'x at 515; *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989).

appreciation of her functionality is at odds with the ALJ's conclusion.  To reach the conclusion she did, the ALJ had to find the claimant's testimony lacking in credibility.  Making credibility determinations is part of the ALJ's job.[88]  But when the claimant's testimony is discounted, there was no other evidence in the record supporting the ALJ's findings.  In particular, there are no test results, clinical findings, or laboratory findings supporting the ALJ's conclusion that the claimant has the residual functional capacity to perform sedentary or light work.  Thus, the record contains insufficient evidence for the ALJ to fairly evaluate the claimant's residual functional capacity or her ability to perform her past relevant work as a receptionist. Accordingly, the case must be remanded for additional evidence concerning the claimant's ability to function in the work place, particularly her ability to lift and carry and her ability to sit for long periods of time.

## I.   DID THE ALJ ERR BY RENDERING A DECISION WITHOUT CONSIDERING THE ENTIRE RECORD?

The claimant argues that the Commissioner's decision is flawed because the ALJ failed to consider all evidence in the record.  At the hearing held on March 26, 2013, the record was left open so that the claimant could submit additional documents.  Those documents were added to the record on June 3, 2013.  The ALJ's

---

[88]     *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).

decision was dated June 5, 2013.  The ALJ's opinion does not expressly mention the supplement to the record.  However, it is plausible that the two days between the submission of the documents and the publication of the ALJ's decision were sufficient to permit review of the newly-added documents.  Furthermore, the mere fact that the ALJ did not mention the supplemental materials in her decision does not mean that she failed to consider them, especially since the ALJ stated that she had carefully considered all of the evidence in making her decision.[89]  As the Fifth Circuit has noted, "[t]he fact that the ALJ cited certain evidence that he felt supported his decision does not mean that he failed to consider all of the other evidence in the record.  To the contrary, his decision states expressly that it was made '[a]fter careful consideration of all the evidence,' and we see no reason or evidence to dispute his assertion."[90]  That statement is equally applicable here.

The claimant complains, in particular, that the last MRI mentioned by the ALJ was the lumbar MRI from April 2011, which was normal.  The claimant had a cervical MRI on August 2, 2012.[91]  It revealed "a very mild broad-based disc bulge at C3-4-C6-7 with only minimal indentation upon the anterior thecal sac.  There is no

---

[89]    Rec. Doc. 3-1 at 23.

[90]    *Brunson v. Astrue*, 387 F. App'x 459, 461 (5th Cir. 2010).

[91]    Rec. Doc. 3-1 at 561-565.

central or lateral stenosis.  The cervical cord demonstrated normal appearance without findings of syrinx formation or myelomalacia."   The results of this test were compared to those of a cervical MRI performed on April 15, 2010.  The disc bulges were noted to be similar to those detected in 2010.  Further, there were "[n]o enhancing scarring or new areas of disc herniation noted.  Cervical cord demonstrates normal signal appearance."  Because this cervical MRI is not substantially different from the previous one, the ALJ's failure to expressly mention it in her ruling is not significant.  The claimant's argument that the ALJ erred by failing to consider all of the evidence in the record lacks merit.

<u>CONCLUSION AND RECOMMENDATION</u>

This Court finds that the ALJ's conclusions that the claimant retains the residual functional capacity to perform the full range of light work and is capable of performing her past relevant work as a receptionist are not supported by substantial evidence in the record.  Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision be **REVERSED and REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (1) fully and completely develop the record with regard the claimant's residual functional capacity by obtaining a functional analysis by a treating physician or by a consultative examiner who meets with the claimant and

evaluates her functionality; (2) permit the claimant to supplement the record as appropriate or necessary; (3) again evaluate the claimant's residual functional capacity; and (4) again evaluate whether the claimant was disabled on or after May 31, 2009.

Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act.[92]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual

---

[92]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 10th day of December 2015.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

COPY SENT:

DATE:  __12/10/2015_____
BY: _____EFA_____
TO: _____RTH_____
             pj

-29-